**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| LISA ANN MATCHETTE,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 5:25-CV-01485<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Lisa Ann Matchette ("Plaintiff" or "Ms. Matchette") seeks judicial review of the final decision of Defendant Commissioner of Social Security denying her application for Social Security disability benefits. (ECF Doc. 1, ECF Doc. 8.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF Doc. 7.) For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I. Procedural History

On September 23, 2021, Ms. Matchette filed an application for Disability Insurance Benefits ("DIB"), alleging disability as of May 21, 2021. (Tr. 230-31, 952.) She alleged disability due to hypermobile Ehlers Danlos Syndrome, scoliosis, degenerative disc disease, postural orthostatic tachycardia syndrome ("POTS"), migraines, depression, anxiety, hallux valgus, and dysplasia of cervical and thoracic spines. (Tr. 111, 117, 253.) After denial of her claims at the initial and reconsideration levels (Tr. 108-11, 114-23), she requested a hearing (Tr.

125-27). Ms. Matchette received two unfavorable Administrative Law Judge ("ALJ") decisions. (Tr. 21-42, 949-77.)

The first unfavorable ALJ decision was issued on March 9, 2023 (Tr. 21-42, 952), after an administrative hearing on January 5, 2023 (Tr. 43-71). The case was remanded by the District Court per stipulation of the parties in June 2024. (Tr. 952, 1029-30.) The Appeals Council vacated the final decision of the Commissioner on December 16, 2024[1] (Tr. 1019-25), finding it did not provide an adequate evaluation of Ms. Matchette's residual functional capacity ("RFC"), "particularly the effects regarding the intensity, persistence, and limiting effects of her migraine headaches" (Tr. 1021). It concluded that further evaluation was required as to the limiting effects of Ms. Matchette's headache disorder on the RFC and whether her headache disorder medically equaled Listing 11.02. (Tr. 1021-22.) On remand, the Appeals Council ordered the ALJ to further evaluate Ms. Matchette's migraine headaches as required by Social Security Ruling (SSR) 19-4p (Tr. 1022) and consolidate the remanded claim file with Ms. Matchette's subsequently filed claim and issue a new decision on the consolidated claims. (Tr. 1022.)

Following remand, a second hearing was held before the same ALJ on April 1, 2025. (Tr. 983-1018.) The second unfavorable ALJ decision was issued on April 29, 2025. (Tr. 949-77.) The ALJ found Ms. Matchette had not been under a disability within the meaning of the Social Security Act from May 21, 2021, through the date of the decision. (*Id.*) On July 16, 2025, Ms. Matchette filed a Complaint challenging the Commissioner's final April 29, 2025 decision denying her application for DIB.[2] (ECF Doc. 1.) The matter is fully briefed. (ECF Docs. 8, 10, 11.) Ms. Matchette raises two assignments of error in this appeal:

---

[1] Ms. Matchette filed a subsequent DIB application on March 12, 2024. (Tr. 1032.)

[2] Ms. Matchette filed but withdrew exceptions to the decision after she filed this district court action. (Tr. 978.)

(1) The ALJ erroneously failed to comply with the Order of Remand at Step Three of the Sequential Evaluation when she failed to properly evaluate Plaintiff's migraine headaches and find that Plaintiff equaled Listing 11.02B; and

(2) The ALJ erred when she failed to support her conclusions or discuss supportability and consistency when she evaluated the opinions of treating sources.

(ECF Doc. 8, pp. 1, 11-23; ECF Doc. 11.)

## II. Evidence[3]

### A. Personal, Educational, and Vocational Evidence

Ms. Matchette was born in 1979, making her a younger individual under Social Security regulations on the alleged disability onset date. (Tr. 230, 968.) She has a master's degree in physiology of exercise (Tr. 50, 992) and served in the military for three years (Tr. 50). She most recently worked as a medical and surgical assistant. (Tr. 50, 968, 992.) She stopped working on May 21, 2021. (Tr. 253, 955, 992.)

### B. Relevant Treatment History[4]

Ms. Matchette established care with Neal Manning, M.D., at Springfield Primary Care in November 2020. (Tr. 311-14.) Reported problems included paresthesia, migraine headaches, nausea, neck pain, and arm swelling. (Tr. 311-12.) Ms. Matchette was seeing a chiropractor for right sided neck pain that had been ongoing for several years. (Tr. 313.) She reported recent episodes of tunnel vision while driving that in at least one instance required her to pull off the side of the road. (*Id.*) Dr. Manning referred her to a neurologist for further evaluation. (*Id.*)

---

[3] Both parties' factual summaries misstate dates of treatment records and/or cite transcript pages unrelated to medical evidence being summarized. While the Court recognizes that summarizing voluminous records may result in an occasional inaccurate citation, the parties are reminded to review briefs to ensure accurate citations so that briefing assists rather than hinders the Court's review process.

[4] While the ALJ found Ms. Matchette had severe physical and mental impairments (Tr. 955), Ms. Matchette only challenges the ALJ's findings relating to physical impairments (ECF Docs. 8, 11). The medical records summarized herein are therefore limited to the records relevant to Ms. Matchette's assignments of error.

During a visit with Dr. Manning on January 4, 2021, Ms. Matchette reported no further episodes of tunnel vision (Tr. 316.) Dr. Manning noted that Ms. Matchette's migraines were "under tolerable control with topiramate." (*Id.*) But she had had episodes of kidney stones since being on topiramate and told Dr. Manning that she felt the medication gave her no benefit. (*Id.*) She had right-sided jaw pain consistent with temporomandibular joint (TMJ) disorder and declined Botox injections because of a prior reaction to injections. (*Id.*)

Ms. Matchette returned to Dr. Manning for follow up regarding tachycardia, orthostasis, paresthesias, palpitations, and migraine headaches on February 19, 2021. (Tr. 308.) Dr. Manning was weaning her off gabapentin to address her tachycardia; he told her to call if her paresthesias worsened. (*Id.*) Ms. Matchette stopped taking Topamax to see if it was contributing to her palpitations, denying recurrence of headaches since stopping Topamax. (Tr. 309.)

In or around June 2021, Ms. Matchette filed an application for VA benefits, alleging disability due to headaches and back, knee, and neck problems. (Tr. 483.) On June 24, 2021, a series of VA Compensation and Pension (C&P) examinations were conducted. (Tr. 422-83.) Examinations showed normal strength in the hips, knees, and ankles (Tr. 432); no atrophy (Tr. 433); normal deep tendon reflexes in her knees and ankles (Tr. 433-34); intact sensation to light touch in the lower extremities (Tr. 434); negative straight leg raise testing bilaterally (Tr. 435); no signs of radicular pain (*id.*); crepitus and reduced range of motion in the knees with no tenderness or pain with palpation (Tr. 452-53); normal range of motion in the cervical spine (Tr. 476); normal strength in the elbows, wrists, and fingers (Tr. 479); and normal deep tendon reflexes and intact sensation to light touch in the upper extremities (Tr. 479-80).

On July 26, 2021, Ms. Matchette presented to Rex D. Wilford, M.D., at the VA to establish care with a new primary care physician. (Tr. 326.) She reported a prior diagnosis of

POTS. (*Id.*) Her main complaint was "pulling and burning" that started in the "right axilla and breast to back and up into [her] right ear in a 'question mark' pattern." (*Id.*) She was staying off Topamax because it was causing kidney stones. (*Id.*) She reported having two migraines a month. (*Id.*) She also had heavy menses and said her axilla/neck pain and migraines were worse with her menses. (*Id.*) She used Tylenol, a dark room, and ice packs to treat her migraines. (*Id.*) Examination findings were generally normal with the exception of positive Tinel's and Phalen's in the right wrist and severe pain with palpation over the right ear and arm. (Tr. 327.) She was diagnosed with POTS, kidney stones, menorrhagia with pelvic prolapse, migraines, right axillary discomfort, neuralgia, and osteoarthritis in the left knee with low back and neck pain. (*Id.*)

MRIs of the lumbar, thoracic, and cervical spine were taken in August 2021. (Tr. 330-31.) Dr. Wilford reviewed the imaging, finding that the MRIs showed a normal spinal cord, no fractures or dislocations, degenerative disc disease most prominent in the cervical spine with some present in the thoracic and lumbar spine, and some arthritic changes in the low back. (*Id.*) Dr. Wilford noted that cervical degenerative disc disease could be contributing to Ms. Matchette's right armpit symptoms. (Tr. 331.)

Ms. Matchette attended physical therapy for her right arm, shoulder, and neck pain in March 2022. (Tr. 614-17.) On April 25, 2022, Ms. Matchette presented to nurse practitioner Denise Nester for a pain management consultation regarding her neck and right arm pain. (Tr. 863-65.) Examination findings were generally normal except for pain over the cervical paraspinous muscles and with neck flexion, extension, and lateral flexion. (Tr. 864.) NP Nester stated that Ms. Matchette's presentation correlated with her imaging. (*Id.*) She discussed conservative measures with Ms. Matchette, including physical therapy, medication, and injections for her diagnoses of cervical radiculopathy and cervical spondylosis. (*Id.*)

On January 21, 2022, Ms. Matchette returned to Dr. Wilford for follow-up. (Tr. 640-45.) She reported her migraines were "ok"; they were better on medication, but she said she did not want kidney stones. (Tr. 641.) She felt her morning headaches were due to undiagnosed sleep apnea. (*Id.*) She was supposed to have a lab polysomnogram the year before, but did not get it. (*Id.*) She still had significant back and neck pain. (*Id.*) Her left knee was "achy but fine." (*Id.*) Examination findings were generally normal except that her right axilla was tender. (Tr. 642.)

On February 18, 2022, Ms. Matchette presented to chiropractor Andria D'Amato for a pain management consultation for cervical/lumbar and unusual right axillary pain. (Tr. 665.) She reported multiple areas of pain, most notably neck pain into the right shoulder. (*Id.*) She also reported pain in the jaw, neck, and trapezius muscles. (*Id.*) Examination findings included: decreased and painful range of motion in the right shoulder and arm; a positive Apley Scratch Test on the right; cervical and paraspinal hypertonicity; grade I tenderness of the cervical and thoracic spine; 4/5 strength in the right shoulders, biceps, and triceps; 5/5 strength on the left; 5/5 strength in the wrists, fingers, and grip; a positive bilateral shoulder decompression test; positive neutral cervical compression test on the right; and myofascial trigger points in the cervical spine, thoracic spine, and right shoulder. (Tr. 666-67.) A physical therapy consultation was ordered, with acupuncture and chiropractic treatments to be considered at a later date. (Tr. 667.)

During a pain management visit with NP Nester on April 25, 2022, Ms. Matchette reported burning and pulling pain in the right arm and numbness and tingling in her right hand and legs/feet. (Tr. 863.) Her gait was steady, and she was able to walk in tandem and on her toes and heels. (Tr. 864.) Pain to palpation was noted over the cervical paraspinous muscles. (*Id.*) Spurling's and Hoffman's tests were negative. (*Id.*) She exhibited pain with neck flexion, extension, and lateral flexion, but a normal cervical spine range of motion. (*Id.*) She had 5/5

strength in the upper and lower extremities, normal deep reflexes, and intact sensation to pinprick in the arms bilaterally. (*Id.*) Cervical epidural injections were scheduled. (*Id.*)

On July 22, 2022, Ms. Matchette returned to Dr. Wilford, reporting that her migraines were "hit or miss," weather related, and "not as bad as [they] used to be." (Tr. 854.) She was seeing a massage therapist, and said it was very helpful for her right neck, shoulder, and arm symptoms. (*Id.*) She said her left knee was doing "ok" and her back pain was "stable." (*Id.*) Her physical examination findings were normal except for mild pain in the right wrist. (Tr. 855.)

During a pain management appointment on August 12, 2022, Ms. Matchette reported "significant improvement in some of her pain symptoms" since receiving occipital nerve block and trigger point injections. (Tr. 851.) Her main concern was her right arm and breast tenderness with burning symptoms. (*Id.*) She was using a walking stick during the appointment and reported pain along the outside of her right foot, with "lightning bolts with lateral movement." (*Id.*) On November 29, 2022, Ms. Matchette attended an occupational therapy consultation for edema and pain in her right breast and right upper extremity. (Tr. 931.) She also reported neuropathy in her right hand. (Tr. 933.) It was recommended that Ms. Matchette continue with massotherapy and acupuncture for pain relief. (*Id.*)

On April 19, 2023, Ms. Matchette presented to physical therapist Christopher Wood, PT, for a functional capacity evaluation for purposes of seeking social security disability benefits. (Tr. 1364-69.) She reported a history of right shoulder and right sided neck pain, with pain going down her right arm, right-sided TMJ, and right-sided low back, hip, and knee pain. (Tr. 1365.) She reported a history of migraines with "less frequency to 2-3 x per month." (*Id.*) She reported occasional buckling of her knee, catching her right foot on the step, and low back pain that had caused her to fall. (*Id.*) She said she used a walking stick at times or furniture as a guide. (*Id.*)

During her examination, Ms. Matchette shifted positions due to low back and right hip pain. (Tr. 1366.) Range of motion was normal in her upper and lower extremities, neck, and back. (*Id.*) She had 4+/5 strength in her upper extremities, and her grasping ability was within normal limits. (*Id.*) She used her hands to safely move from sitting to standing position. (*Id.*) Ms. Matchette's balance was normal during static stance testing, but her gait was antalgic and she had a positive Rhomberg test. (Tr. 1366-67.) The maximum weight Ms. Matchette was able to lift was 10 pounds. (Tr. 1368.) PT Wood noted that Ms. Matchette had difficulty during testing due to worsening balance and pain in the cervical and lumbar spine. (*Id.*) He observed that she needed "constant support from the treatment table when standing for balance correction." (*Id.*) PT Wood indicated that Ms. Matchette "tested into a sedentary work category," but he found she was not "capable of performing this type of work" because it "would likely exacerbate her current condition, result in injury to herself, lead to potential injury to other employees/patients, or result in damage to equipment/materials." (Tr. 1369.)

On January 16, 2024, Ms. Matchette returned to Dr. Wilford for follow-up. (Tr. 1335-38.) She reported no syncope. (Tr. 336.) She still got lightheaded when standing but said it was controllable. (*Id.*) She still had occasional tachycardia but less than in the past. (*Id.*) She was sleeping better, hydrating well, and had no kidney stones. (*Id.*) She said her migraines were stable; she treated them once a week with a cold pack and avoided using medication. (*Id.*) She said her back and neck pain were "always a problem," but her knee was stable and her right wrist was okay. (*Id.*) She reported that her right arm hurt significantly when she did yoga. (*Id.*) Her main issue was swelling in the right axillary and "'backed up lymph nodes.'" (*Id.*) Ms. Matchette felt more massage therapy was needed. (*Id.*) Examination revealed no edema in the

lower leg, a nonfocal neurologic exam, no pain with Spurling on neck, no pitting edema in right axilla, and mild symptoms with Tinel's on the right wrist. (Tr. 1337.)

On June 10, 2024, Ms. Matchette saw Dr. Wilford for follow up regarding left ankle pain and swelling. (Tr. 1293-94.) She also had paperwork for her disability claim. (Tr. 1294.) She reported occasional palpitations related to POTS and occasional wheezing. (*Id.*) She said that albuterol helped with the wheezing. (*Id.*) Examination of the lower leg showed a "large pocket of edema over left lateral malleolus, no redness, only mild tender to palpation, no crepitus, strong left pedal pulses, cap refill < 2 seconds, mild decrease foot arch, no crepitus with ankle motion, Thompson test normal (no signs of achilles tear)." (Tr. 1295.) Dr. Wilford noted that he filled out the disability paperwork and returned it as requested with a copy of PT Wood's April 19, 2023 functional capacity evaluation. (Tr. 1296.)

Ms. Matchette returned to Dr. Wilford for a follow up on July 16, 2024. (Tr. 1454-55.) She reported having to use albuterol a couple of times during the summer for wheezing but said she had no significant cough or shortness of breath. (Tr. 1455.) She reported no kidney stones and said her "migraines [were] manageable but 'better than kidney stones.'" (*Id.*) She said she ran out of massage treatments and was starting to have neuralgic pain on the right side of her neck, head, and shoulder. (*Id.*) Her left ankle edema had decreased slightly. (Tr. 1455-46.) She reported that she was using diclofenac gel and a brace and they helped. (Tr. 1456.) She said her knee, low back, and right wrist pain were stable. (*Id.*)

On July 23, 2024, Ms. Matchette had a physical therapy consultation (Tr. 1446) and a podiatry consultation regarding her left ankle pain (Tr. 1442). During her podiatry consultation, Ms. Matchette also described numbness in her hands and toes and reported hand weakness. (Tr. 1445.) Dr. Suhad Hadid, the podiatrist, diagnosed left ankle pain, early bilateral foot drop,

bilateral neuritis, and chronic lower back pain. (*Id.*) On July 29, 2024, Ms. Matchette had a pain management consultation regarding her low back pain. (Tr. 1434.)

**C. Relevant Medical Opinion Evidence**

**1. Treating Source**

On June 11, 2024, Dr. Wilford completed two medical source statements. (Tr. 1265-68, 1269-72.) The medical source statements have slightly different formatting but Dr. Wilford's opinions as to Ms. Matchette's functional limitations are substantially similar. (*Id.*) Dr. Wilford identified multiple impairments/diagnoses, including cervicalgia, neuralgia, back pain, hip and knee pain, and POTS. (Tr. 1265, 1269.) He did not identify migraines or headaches as a diagnosed impairment or a symptom. (*Id.*)

Dr. Wilford opined that Ms. Matchette could: sit for less than two hours in an eight-hour workday and for 15-20 minutes at one time; stand/walk for less than two hours in a workday and for 10 minutes at one time; needed to shift positions at will from sitting, standing, or walking; had to walk every 20 minutes for two minutes at a time; needed unscheduled work breaks every hour that would last 20-30 minutes and require her to lie down; needed to elevate her legs above her heart 50% of the time; could occasionally lift less than 10 pounds and rarely lift 10 pounds; could rarely twist, stoop, or climb stairs; could never crouch, squat, or climb ladders; could never reach overhead with her right upper extremity and could reach overhead with her left upper extremity 25% of the workday; could reach in front of her body and perform fingering and handling with the right arm/hard 10% of the workday, and 50% of the workday with the left arm/hand; would be off task 25% or more of the time; and would be absent more than four days monthly. (Tr. 1266-68, 1270-72.)

**2. Examining Source**

On April 19, 2023, Ms. Matchette presented to physical therapist Christopher Wood for a functional capacity evaluation for her social security disability application. (Tr. 1364-69.) Following the evaluation, Mr. Wood completed a medical source statement on April 20, 2023. (Tr. 1740-43.) Mr. Wood listed cervical and lumbar spondylosis as Ms. Matchette's diagnoses and rated her prognosis as "poor – fair." (Tr. 1740.) He reported that Ms. Matchette had constant upper extremity, cervical, and lumbar pain along with upper extremity swelling. (*Id.*) He also reported that she exhibited weakness, postural loss, and loss of balance. (*Id.*)

Mr. Wood opined that Ms. Matchette could: sit for about four hours total in an eight-hour workday and for 15-20 minutes at one time; stand and/or walk for less than two hours in a workday and for 10 minutes at one time; had to walk around every 15 minutes for five minutes at a time; needed two-to-three unscheduled work breaks during the workday that would last five-to-fifteen minutes; could occasionally lift less than 10 pounds; could rarely lift 10 pounds and never lift 20 or more pounds; had reaching limitations with the bilateral upper extremities and handling and fingering limitations with the right upper extremity; would be off task 15% of a workday; and would be absent about four days monthly. (Tr. 1741-43.)

**3. State Agency Medical Consultants**

On January 12, 2022, state agency medical consultant Gary Hinzman, M.D., completed a Physical RFC Assessment. (Tr. 85-87.) Dr. Hinzman found that Ms. Matchette's impairments did not meet a Listing. (Tr. 84-85.) He opined that Ms. Matchette had the RFC to: occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; stand and/or walk for a total of six hours; sit for a total of six hours; never climb ladders/ropes/scaffolds; occasionally

climb ramps/stairs, stoop, kneel, crouch, and crawl; and frequently balance; but should avoid exposure to unprotected heights or moving mechanical parts. (Tr. 85-87.)

On April 30, 2022, state agency medical consultant Elizabeth Das, M.D., completed a Physical RFC Assessment on reconsideration. (Tr. 97-98.) Dr. Das affirmed Dr. Hinzman's RFC Assessment. (Tr. 98.)

With respect to Ms. Matchette's later filed application,[5] state agency medical consultant Steve McKee, M.D., completed a Physical RFC Assessment on August 16, 2024. (Tr. 1038-40.) Dr. McKee found Ms. Matchette's impairments did not meet a Listing. (Tr. 1037.) He opined that Ms. Matchette had the RFC to: occasionally lift and/or carry 10 pounds and frequently lift and/or carry less than 10 pounds; stand and/or walk for a total of two hours; sit for a total of six hours; never climb ladders/ropes/scaffolds; occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; and frequently balance; but should avoid exposure to unprotected heights or moving mechanical parts and concentrated exposure to extreme hot or cold. (Tr. 1038-40.)

**4. Medical Expert**

Neurologist Vladimir Karpitskiy, M.D., Ph.D., testified at the second administrative hearing as a medical expert. (Tr. 1004-11, 1586-89.) He testified that migraines were one of Ms. Matchette's severe impairments. (Tr. 1005, 1009.) He opined that none of her impairments met or medically equaled a listing. (Tr. 1005-06.) He considered Listing 11.02B, but opined that Ms. Matchette did not meet that listing. (Tr. 1006.) He explained that it was "borderline" whether she met the frequency requirement for Listing 11.02B. (Tr. 1006, 1010.) But even if she met the frequency requirement, he opined that she did not meet the requirement that she

[5] As discussed in Section I, *supra*, when the matter was remanded, the Appeals Council ordered consolidation of Ms. Matchette's claims. (Tr. 1022.)

"adhere to prescribed medication." (*Id.*) While Ms. Matchette reported that she could not tolerate medication, he explained the only medication he had "documents for [wa]s Topamax," and she declined Botox injections when offered. (Tr. 1006.) He explained that there were new migraine medications with minimal side effects that Ms. Matchette had not tried. (Tr. 1006-07.)

When asked whether Ms. Matchette had any functional limitations as a result of her impairments, Dr. Karpitskiy testified that he agreed with the limitations set forth in the medical source statement at 10F in the record—the June 11, 2024 opinion of Dr. Wilford (Tr. 1265-68). (Tr. 1007-08, 1010.) While he testified that he agreed with the limitations in 10F, he explained that migraines were not listed as an impairment or symptom in the opinion. (Tr. 1007-09.) Thus, he opined that those limitations were due to other medical conditions, not migraines. (Tr. 1007-09.) As far as limitations relating to migraines, he testified that Ms. Matchette should not be exposed to fumes, strong odors, or bright lights. (Tr. 1009.)

**D. Plaintiff's Function Report**

In a Function Report completed on December 4, 2021 (262-69), Ms. Matchette reported pain with long-term sitting and standing with muscle spasms on her right side (Tr. 262). She said she was advised to limit her lifting to two pounds due to degenerative hypermobility. (*Id.*) She could not lift, squat, or get her heart rate too high, and her "migraines and nausea limited her availability." (*Id.*) Buttoning was getting harder for her, and she had to use her left hand for self-care. (Tr. 263.) She said that her migraines were so bad at times that she had to sit in a dark room with an ice pack. (*Id.*) The medication she had been on for her migraines—Topamax—was discontinued because it caused kidney stones. (Tr. 263, 269.) She was the primary caretaker for her seven-year-old-daughter.[6] (Tr. 263.) She reported: taking care of two dogs;

[6] She had some help from a family member (Tr. 263) and her daughter's father (Tr. 994-95).

preparing mostly crock pot or "stick in the oven" meals; doing some light sweeping and dusting; mowing the lawn on "good days" with a self-propelled or riding mower; driving, but not on highways; shopping, but mostly online; reading, crafting, sewing, and gardening when able to; and volunteering for charity and the local parent teacher student organization. (Tr. 263-66.)

**E. Hearing Testimony**

Ms. Matchette testified at the hearings on January 5, 2023 (Tr. 48-64), and April 1, 2025 (Tr. 991-1004, 1017).[7] At the most recent hearing, she reported two or three migraines a week. (Tr. 995-96.) She said she stopped taking Topamax for her migraines because it caused 19 to 25 kidney stones and renal impairments. (Tr. 996; *see also* Tr. 62.) She had sumatriptan for emergencies, but she said she did not tolerate it well. (Tr. 997.) She also tried Botox, other migraine medications, and nerve blocks but could not tolerate them. (Tr. 996, 1017.) She was trying to work with mesotherapy (Tr. 996). She got very nauseous when she had a migraine and had to be in a dark room with "as little disturbance as possible" to "sleep it off." (Tr. 997.)

Ms. Matchette reported symptoms including dizziness, nausea, muscle spasms, spinal column shifting, subluxation, nerve impingement, numbness in her right upper extremity, and "ortho issues with all of [her] joints." (Tr. 997-99.) She said most positions were uncomfortable and she had to get up often and move around. (Tr. 1000.) She could not comfortably lift a gallon of milk and used a grocery delivery service because going herself was "horrible." (*Id.*) She said her geneticist recommended a lifting limit between two and half to five pounds in 2020. (Tr. 1001.) She did chores at home but had to limit herself and took at least a thirty-minute break every thirty minutes to rest. (Tr. 1001.) She did some crafting but had to get up after sitting for about an hour to take a break. (Tr. 1002-03.)

[7] Vocational experts also testified at the two hearings. (Tr. 64-69, 1011-16.)

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work in the national economy. *Id.*

## IV. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive[.]" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the

courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

### B. First Assignment of Error: The ALJ Complied with the Order of Remand and Properly Evaluated Plaintiff's Migraine Headaches at Step Three

In her first assignment of error, Ms. Matchette argues that the ALJ did not comply with the Appeals Council's Order of Remand relating to the assessment of her migraine headaches at Step Three of the sequential analysis. (ECF Doc. 8, pp. 1, 11-15, 23; ECF Doc. 11.) More specifically, she argues that the ALJ erred when she "failed to discuss the frequency of migraine headaches in conjunction with Listing 11.02B," "failed to find that Plaintiff equaled Listing 11.02B," and "discount[ed] the evidence establishing that Plaintiff satisfied the criteria of Ruling

19-4p, and therefore, Listing 11.02." (ECF Doc. 8, pp. 13, 15.)[8] In response, the Commissioner argues that Ms. Matchette did not meet her burden to show that her headache impairment medically equaled Listing 11.02B, both because she has no medical source opinion to show that she equaled the Listing and because she did not adhere to prescribed treatment as the Listing requires. (ECF Doc. 10, pp. 5-8.)

**1. Legal Framework for Step Three Evaluation of Headaches**

At Step Three of the disability evaluation, a claimant is disabled if her impairment meets or equals one of the listings in the Listing of Impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii). "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'" *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1525(c)(3)). The claimant bears the burden to prove that her condition meets or equals a listing. *See* 20 C.F.R. § 404.1520(d); *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014) (citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001)). To do so, she "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

While there is no listing for headaches, SSR 19-4p provides guidance on how "primary headache disorders" such as migraines are established and evaluated, SSR 19-4p, *Evaluating Cases Involving Primary Headache Disorders*, 84 Fed. Reg. 44667, 44667-71 (Aug 26, 2019),

[8] Ms. Matchette also asserts that the ALJ: "failed to comply with the Order of Remand when she found that the limitations imposed by Dr. Karpitsky were unpersuasive"; and "erred when she failed to discuss any effects the headaches would have on [her] ability to engage in substantial gainful activity on a full-time and sustained basis." (ECF Doc. 8, pp. 13, 14-15.) These conclusory arguments relate to the ALJ's analysis at Step Four of the sequential analysis, distinct from the Step Three arguments identified in Plaintiff's heading. (*Id.* at pp. 1, 11.) The Court finds the Step Four arguments were inadequately identified and developed, and therefore waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations omitted) (alterations in original).

explaining: "While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing," *id.* at 44671. While a claimant cannot "meet" a listing for headache—as no such listing exists—her headaches could "medically equal" Listing 11.02 for epilepsy. *Id.* SSR 19-4p further addresses the application of Paragraph B of Listing 11.02 to headaches as follows:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

(*Id.*)

To meet her burden to show that an impairment medically equals a listing, Ms. Matchette must prove that "the findings related to [the] impairment(s) [were] at least of equal medical significance to those of a listed impairment." 20 C.F.R. § 404.1526(b)(2). Further, before an ALJ can find she medically equals a listing, the record "must" contain one of the following:

> 1. A prior administrative medical finding from a[] [state agency medical consultant] or [psychological consultant] from the initial or reconsideration adjudication levels supporting the medical equivalence finding, or
>
> 2. [Medical expert] evidence, which may include testimony or written responses to interrogatories, obtained at the hearings level supporting the medical equivalence finding, or
>
> 3. A report from the [Appeals Council]'s medical support staff supporting the medical equivalence finding.

SSR 17-2p, *Evidence Needed by Adjudicators at the Hearings and Appeals Council Levels of the Administrative Review Process to Make Findings About Medical Equivalence*, 82 Fed. Reg. 15263, 15265 (March 27, 2017). Thus, an ALJ may only find medical equivalence at the hearing level if the record contains supportive medical opinion findings from either a state agency consultant or a medical expert. *Id.* And if the ALJ "believes the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment," SSR 17-2p provides that the ALJ need not even "articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment." *Id.*

**2. The ALJ Complied with the Remand Order and Appropriately Evaluated Plaintiff's Migraine Headaches**

When the Appeals Council vacated the prior ALJ decision, it held in pertinent part that "[t]he decision did not adequately address whether [Plaintiff]'s headache disorder met or equaled the Listing of Impairments." (Tr. 1022.) Considering Ms. Matchette's reports that her migraine headaches occurred at least twice a month, the Appeals Council concluded: "Further evaluation on whether [Plaintiff] meets or equals [Listing] 11.02 is necessary." (*Id.*) The Appeals Council accordingly directed the ALJ on remand to "[f]urther evaluate [Ms. Matchette]'s migraine headaches as required by Social Security Ruling 19-4p." (*Id.*)

Ms. Matchette argues that the ALJ did not comply with the Order of Remand because she "failed to discuss the frequency of migraine headaches in conjunction with Listing 11.02B," "failed to find that Plaintiff equaled Listing 11.02B," and "discount[ed] the evidence establishing that Plaintiff satisfied the criteria of Ruling 19-4p, and therefore, Listing 11.02." (ECF Doc. 8, pp. 13, 15.) For the reasons explained below, the Court finds these arguments do not have merit.

In support of her first argument—that the ALJ "failed to discuss the frequency of migraine headaches in conjunction with Listing 11.02B" (*id.* at p. 13)—Ms. Matchette cites her

report of two headaches per month in July 2021, her report in May 2024 that she was treating her migraines once per week with a cold pack, and her hearing testimony that she had two to three headaches per week (*id.* at pp. 12-13). But a review of the ALJ's decision reveals that the ALJ discussed and considered the same evidence. (*See* Tr. 961 (6/14/21 report); Tr. 964 (1/24 report); Tr. 967 (hearing testimony).) The ALJ also discussed and considered Ms. Matchette's reports to providers that: she "stopped taking her migraine medication . . . without an increase in headaches" (Tr. 958); "her migraines remained quiescent off medication" (*id.*); her "'migraines' were 'hit or miss [and] weather-related,' and 'not as bad as [they] used to be'" (Tr. 963 (alterations in original)); "her migraines were 'controlled'" (Tr. 964); her migraines were "'manageable'" (Tr. 965); and "she had a history of migraine headaches 'in the mornings especially'" (Tr. 966). After discussing Ms. Matchette's subjective complaints and treatment records, the ALJ addressed the evidence regarding migraine headaches as follows:

> Nothing in this evidence, or in the longitudinal evidence of record, supports a finding of disability or the magnitude of dysfunction alleged. This case was remanded for a more thorough assessment of the claimant's migraine/headache impairment. The record with regard to this impairment establishes that the claimant's headache complaints date to the late 1990's; that for several months prior to her alleged disability onset, the claimant took no medication for her headaches apart from Tylenol; that since that time, she has continued to take no medication for her headaches apart from Tylenol; that she will also utilize ice and rest; and that with these modalities, the claimant has routinely described her headaches as manageable, without reference to the severity of pain and daily interference she alleges herein.
>
> Moreover, the claimant's headaches, and several other of her reported symptoms, are described to be worse in the morning, due to poor sleep (and a lack of REM sleep) to which pain, anxiety, chronic cannabis use contribute, but the claimant has pursued limited pain management follow through, she has remained out of specialized mental health care, she has not sought treatment, medication, or any other general or specialized interventions for sleep, and she continues her use of medical marijuana.

(Tr. 966-67 (emphasis added).) Thus, the ALJ clearly considered the reported frequency of Ms. Matchette's migraine headaches in assessing her claim for disability benefits.

Turning more specifically to Ms. Matchette's assertion that the ALJ failed to discuss the frequency of her migraine headaches "in conjunction with Listing 11.02B," the ALJ discussed the evidence relevant to migraine headaches at Step Three as follows:

> The claimant does not allege that her impairments, singly or in combination, meet or medically equal a listed impairment. The medical evidence does not document the severity of signs, symptoms, findings, or dysfunction necessary to satisfy the criteria of any listed impairment, and no acceptable medical source designated to make such findings has concluded that the claimant has a migraine or other impairment or combination of impairments that medically equals listing- level severity (1A, 4A, 11A; SSRs 17-2p, 19-4p).
>
> Impartial medical expert Dr. Karpitsk[i]y testified with regard to the claimant's headaches that, although the record is fairly bereft of objective evidence, those headaches could be fairly be considered migraines, and a primary headache impairment, under SSR 19-4p. Dr. Karpitsk[i]y further testified that the claimant's migraines cause no identifiable exertional limitations in her work-related functioning, but that this headache impairment is nevertheless severe, as it does result in some environmental workplace restrictions. Dr. Karpitsk[i]y opined that the claimant has no impairment or combination of impairments that meets or medically equals a listed impairment, and regarding the claimant's migraines, he noted that a host of new migraine medications exist but remain untried, and that because compliance with prescribed medication is a prerequisite to a finding of medical equivalence under Listing 11.02, the claimant's migraines, even if occurring once weekly as reported, cannot be found to medically equal Listing 11.02. The undersigned finds Dr. Karpitsk[i]y's testimony supported, consistent with the medical and other opinion evidence of record, and persuasive.

(Tr. 955-56 (emphasis added).) Thus, the ALJ explained that: (1) no acceptable medical source found Ms. Matchette's migraine headaches medically equaled a listing; and (2) a persuasive medical opinion found Ms. Matchette could not show medical equivalence under Listing 11.02 "even if" her migraines "occur[] once weekly as reported" because Ms. Matchette did not meet the prerequisite of "compliance with prescribed medication." (*Id.*) Thus, the ALJ identified two grounds to support her finding that medical equivalence was not established under Listing 11.02, and explained that the alleged frequency of the headaches would not change the analysis. Thus, the ALJ appropriately "considered migraine frequency in conjunction with Listing 11.02B."

In support of her second argument—that the ALJ erred when she "failed to find that Plaintiff equaled Listing 11.02B" (ECF Doc. 8, p. 13)—Ms. Matchette asserts that the ALJ erred because "she failed to find that the combination of the treatment notes and Plaintiff's testimony satisfied all the elements of" SSR 19-4p (*id.* at p. 14). The Commissioner responds that Ms. Matchette did not meet her burden to show medical equivalence because: (1) "no medical source opined that she equaled the Listing"; and (2) Ms. Matchette "also failed to show that she adhered to prescribed treatment as required by the Listing." (ECF Doc. 10, p. 7 (relying on SSR 17-2p).) The Court agrees with the Commissioner on both counts.

As the Commissioner points out, SSR 17-2p establishes that the record "must" contain a finding of medical equivalence by a state agency consultant at the initial or reconsideration level or a medical expert at the hearing level before an ALJ may find that a claimant medically equals a listing. SSR 17-2p, 82 Fed. Reg. at 15265. Here, the state agency consultants did not provide such a finding (Tr. 84-85, 95-96, 1037), and the medical expert explicitly testified that Ms. Matchette did not "meet or medically equal any impairment described in the Listing of Impairments" (Tr. 1005-06). Because the record does not contain the required finding of medical equivalence by an acceptable medical source, Ms. Matchette cannot show that the ALJ erred when she found Ms. Matchette did not medically equal Listing 11.02B. Ms. Matchette's argument that SSR 19-4p does not "require[] that a medical source opine that she equals the Listing" (ECF Doc. 11, p. 1) is beside the point, since she identifies no language in SSR 19-4p that would suggest it exempts medical equivalency findings for primary headache disorder from the requirements of SSR 17-2p, which applies to all medial equivalence determinations. *See* SSR 17-2p, 82 Fed. Reg. 15263.

Even if the ALJ's medical equivalence finding were not dictated by SSR 17-2p, the Commissioner is also correct that Ms. Matchette has not met her burden to "present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker*, 93 F. App'x at 728. As explained in SSR 19-4p, "Paragraph B of listing 11.02 requires dyscognitive seizures [1] occurring at least once a week for at least 3 consecutive months [2] despite adherence to prescribed treatment." 84 Fed. Reg. at 44671. Medical expert Dr. Karpitskiy acknowledged both of these requirements in his testimony, explaining: "maybe [Ms. Matchette] meets with frequency, maybe she's not [sic], but the requirement to meet this listing is to adhere to prescribed medication." (Tr. 1006.) He explained that Ms. Matchette's only documented medication for migraines was Topamax, while she declined Botox injections and did not try other available migraine medications. (*Id.*) The ALJ found Dr. Karpitskiy's medical expert testimony "supported, consistent with the medical and other opinion evidence of record, and persuasive," and concluded based on that testimony: "because compliance with prescribed medication is a prerequisite to a finding of medical equivalence under Listing 11.02, the claimant's migraines, even if occurring once weekly as reported, cannot be found to medically equal Listing 11.02." (Tr. 956.) Ms. Matchette has not met her burden to show that the ALJ lacked substantial evidence to support this medical equivalence finding.

Finally, the Court finds Ms. Matchette's third argument—that the ALJ "discount[ed] the evidence establishing that Plaintiff satisfied the criteria of Ruling 19-4p, and therefore, Listing 11.02" (ECF Doc. 8, p. 15)—also lacks merit. Ms. Matchette argues that she stopped taking Topamax because it caused kidney stones and was not able to tolerate many medications. (ECF Doc. 8, p. 13.) But the ALJ acknowledged evidence that Ms. Matchette stopped taking Topamax

based on a suspicion that it caused kidney stones. (Tr. 958.) She also considered evidence that Ms. Matchette reported her migraines to be "quiescent," "controlled," or "manageable" without medication (Tr. 958, 964, 965), and observed that Ms. Matchette "has continued to take no medication for her headaches apart from Tylenol" and "ice and rest," and "with these modalities . . . has routinely described her headaches as manageable, without reference to the severity of pain and daily interference she alleges herein" (Tr. 967). The ALJ also considered and was persuaded by the medical expert testimony of Dr. Karpitskiy that Ms. Matchette did not meet the Listing's requirement that she adhere to prescribed medication because she did not try other available migraine medications. (Tr. 956.) Thus, Ms. Matchette has not met her burden to show that the ALJ improperly discounted evidence or lacked the support of substantial evidence when she found Ms. Matchette's migraines "cannot be found to medically equal Listing 11.02." (*Id.*)

For the reasons set forth above, the Court finds that the ALJ complied with the Order of Remand in assessing Ms. Matchette's migraine headaches at Step Three of the sequential analysis and appropriately analyzed her migraine headaches consistent with SSR 19-4p and Listing 11.02B. Further, the Court finds that Ms. Matchette has not met her burden to show that the ALJ's Step Three medical equivalence finding lacked the support of substantial evidence.

Accordingly, the Court finds the first assignment of error lacks merit.

### C. Second Assignment of Error: The ALJ Properly Evaluated the Supportability and Consistency of Plaintiff's Treating Source Opinions

In her second assignment of error, Ms. Matchette argues the ALJ erred by failing to "support her conclusions or discuss supportability and consistency when she evaluated the opinions of the treating sources." (ECF Doc. 8, pp. 1, 15-23.) Ms. Matchette's assignment of error is directed at the ALJ's evaluation of the persuasiveness of her "treating sources." (*Id.*) The only identified treating source in the second assignment of error is Dr. Wilford, who

authored two medical source statements dated June 11, 2024. (Tr. 1265-68, 1269-72.) The Commissioner argues in response the ALJ properly determined that Dr. Wilford's opinions were unpersuasive, discussing both supportability and consistency. (ECF Doc. 10, pp. 10-12.)

Before addressing whether the ALJ properly evaluated Dr. Wilford's opinions, the Court observes that the argument section of Ms. Matchette's second assignment of error also includes challenges to the ALJ's evaluation of the opinions of physical therapist Mr. Wood, who completed a one-time functional capacity evaluation of Ms. Matchette, and non-examining state agency medical consultant Dr. McKee. (*Id*. at pp. 16-17, 21-23.) The Court finds these separate arguments were inadequately identified as assignments of error and inadequately developed, and were therefore waived.[9] *See McPherson*, 125 F.3d at 995-96.

**1. Framework for Assessing the RFC and Medical Opinion Evidence**

A claimant's RFC "is the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). An ALJ must assess the "residual functional capacity based on all the relevant evidence in [the] case record," *id.*, such as: medical history; medical signs and laboratory findings; effects of treatment; reports of daily activities; lay evidence; recorded observations; medical source statements; symptoms; evidence from attempts to work; need for a structured living environment; and work evaluations, *see* SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34477 (July 2, 1996).

"The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician," *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). Accordingly, an ALJ is "not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Id*. Even

[9] Even if these arguments were properly presented and/or not waived, it is clear that the ALJ addressed the supportability and the consistency of both opinions. (Tr. 963, 965, 967-68.)

where an opinion was given great weight under prior regulation, the Sixth Circuit held "there [was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).

Under applicable regulations, ALJs need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a); *see Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *5 (6th Cir. June 12, 2024) (quoting 20 C.F.R. § 404.1520c(a)). However, they must evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation. 20 C.F.R. § 404.1520c. Those five factors include supportability, consistency, relationship with the claimant, specialization, and other factors; but the most important factors are supportability[10] and consistency.[11] 20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2), 404.1520c(c)(1)-(5). ALJs must therefore explain how they considered consistency and supportability but need not explain how they considered other factors. 20 C.F.R. § 404.1520c(b)(2).

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated her reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence. *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate

---

[10] "Supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in his or her opinion. *See* 20 C.F.R. § 404.1520c(c)(1).

[11] "Consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record. *See* 20 C.F.R. § 404.1520c(c)(2).

findings re: medical opinions); 20 C.F.R. § 404.1520(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

**2. The ALJ Properly Evaluated the Supportability and Consistency of Dr. Wilford's Medical Opinions**

Ms. Matchette asserts that the ALJ "arbitrarily determined" that disabling limitations from Dr. Wilford's opinion were unpersuasive, asserting "[n]o evidence was proffered in support of her conclusion, a conclusion that was neither supported by nor consistent with the medical evidence in this record." (ECF Doc. 8, p. 18.) She also argues that the ALJ "failed to support her determination regarding supportability and consistency of these opinions." (*Id.* at p. 21.)

In assessing the persuasiveness of Dr. Wilford's medical opinions, the ALJ explained:

> In June 2024, Dr. Wilford "filled out disability paperwork for [the claimant]" (12F/13), relying on PT Woods' unsupported conclusions from more than a year earlier to opine that the claimant had a limited capacity to sit, and could do so for no more than "about 2 hours" per day," and that the claimant could stand/walk for no more than 10 minutes at a time and for a total of "less than 2 hours" during an 8-hour workday (11F). In addition, Dr. Wilford advised that the claimant would require a break of up to 30 minutes each hour; that the claimant needed to keep her feet elevated above heart level 50 percent of the workday; that the claimant could lift/carry no more than 10 pounds occasionally; that the claimant could use her dominant right upper extremity to reach, handle, and finger no more than 10 percent of the time, and could use her left upper extremity only 50 percent of the time; and that the claimant would be off task and absent, due to her pain, anxiety, and poor stress tolerance, more than 25 percent of the time and more than 4 days per month, respectively (9F-11F).
>
> As with the opinion of PT Woods, the undersigned finds these limitations internally unsupported and longitudinally inconsistent with the limited findings of record and the claimant's reported parenting, caretaking, and household responsibilities and activities. There is, moreover, no evidence of the claimant being advised to keep, or reporting that she regularly kept, her feet elevated, and the upper extremity limitations opined would essentially preclude the claimant from bathing, dressing, driving, shopping, and cooking, and from completing her other acknowledged parenting, caretaking, and household tasks. Thus, as with the opinion of PT Woods, the undersigned finds these limitations of Dr. Wilford – and of impartial medical expert Dr. Karpitsk[i]y, who adopted them in his testimony – unpersuasive.
>
> According to her June 2024 Function Report (17E), the claimant lives independently with her daughter; she wakes up on "most days … with a migraine,"

> and she then "traverse[s] [her] stairs backward due to mobility issues early in the day" (17E/1). She lets the dog out and feeds him, and then GI issues will leave her the bathroom for "far more time than desired," and "on bad migraine days," she will "go right back to bed, or sleep on the couch" (17E/2). She remains her daughter's custodial parent and primary caregiver, and though she has reported that many of her symptoms date to childhood, the claimant asserted in mid-2024 that she "was previously unlimited on physical exertion," but now has limited physical abilities that also interfere with her concentration/persistence/pace, and she requires assistance and/or multiple breaks to complete routine household and self-care tasks (17E/2). She continues to spend time with others "sitting in the garden or [going for] food with friends," and her hobbies continue to include "church, gardening, community groups [and] reading," but she can be irritated by "nosy" neighbors or other people who "want to know [her] medical problems, and her medications can cause dizziness and sleepiness (17E/4-7).
>
> <u>The claimant did not describe[] elevating her legs, being unable to sit for more than 2 hours a day, and</u> while she noted some upper extremity limitations, <u>her activities do not support the restrictions opined by Dr. Wilford. Further supporting this analysis, July 2024 finds the claimant with a normal gait despite her reported 5/10 low back pain with bilateral foot numbness/tingling and pain that increased with "bending, leaning back, walking, [and] taking stairs" (14F/11), and despite reported left ankle/foot dysfunction that caused her to "trip[] and stumble[] … more [at] the end of the day" (14F/18), and despite findings that included diminished sensation in her bilateral lower extremities distally and 3+/5 left ankle dorsiflexion and inversion (14F/11, 19), and despite ankle imaging that showed diffuse soft tissue swelling and calcification, and "maybe an erosion, … suggestive of gout" (14F/19), as well as lumbar imaging that revealed "further increased degenerative changes," including grade 1 spondylolisthesis of L5 over the transitional segment with L5 pars lysis (14F/34)</u>.

(Tr. 964-65 (emphasis added).) In her earlier assessment of PT Wood's opinion, as referenced in the analysis above, the ALJ had explained:

> <u>An occupational/physical therapy evaluation of the claimant in December 2022 assessed her as having no therapy needs</u> (7F/42), and <u>the undersigned thus finds the April 2023 opinion of Christopher Wood, PT, based on his April 2023 functional capacity evaluation of the claimant, inconsistent with the medical evidence of record, internally unsupported, and unpersuasive</u> (12F/82, 23F). <u>According to PT Wood, the claimant "tested into a sedentary work category," but was "not … capable of performing this type of work</u>," because doing so "would likely exacerbate her current condition, result in additional injury to herself … [or] others, or result in damage to equipment/materials" (12F/86).

(Tr. 963 (emphasis added).) Thus, the ALJ clearly articulated her reasons for finding Dr. Wilford's medical opinions unpersuasive and specifically identified supporting evidence.

Rather than identifying specific errors in the ALJ's reasoning or discussion of the evidentiary record in support of her findings, Ms. Matchette limits her argument to a conclusory assertion that the ALJ made an "arbitrary" decision, did not proffer supporting evidence for her conclusions, and failed to give a coherent explanation of her reasoning, followed by what appears to be a general "cut and paste" of her prior evidentiary summary. (*See* ECF Doc. 8, pp. 17-21; *compare id.* at pp. 2-6.) Given Ms. Matchette's lack of developed argument, the Court need go no further than to observe that she has failed to meet her burden to demonstrate that the ALJ did not properly articulate her reasoning or that the ALJ's findings lacked the support of substantial evidence. Nevertheless, the Court will provide some further discussion below, specifically addressing the ALJ's discussion of supportability and consistency.

Beginning with "consistency"—i.e., the extent to which the opinion findings were consistent with evidence from other medical and nonmedical sources—the ALJ explained that Dr. Wilford's restrictive limitations were "inconsistent with the limited findings of record" and Ms. Matchette's "reported parenting, caretaking, and household responsibilities and activities," citing to specific reported activities and specific examination findings. (Tr. 965.) The ALJ also explained that the opinion was inconsistent with the evidence of record. For example, there was "no evidence of the claimant being advised to keep, or reporting that she regularly kept, her feet elevated," while Dr. Wilford opined that she must elevate her legs above heart level. (*Id.*) In another example, the ALJ noted that the Dr. Wilford's extreme upper extremity limitations—e.g., reaching, handling, and fingering no more than 10% of the time with her dominant right upper extremity, and 50% of the time with her left—"would essentially preclude the claimant from bathing, dressing, driving, shopping, and cooking, and from completing her other

acknowledged parenting, caretaking, and household tasks." (*Id.*) The ALJ adequately and accurately addressed the consistency of Dr. Wilford's opinions.

Turning to "supportability"—i.e., the extent to which Dr. Wilford's objective findings and supporting explanations substantiate or support the findings in his opinion—the ALJ found that Dr. Wilford's opinions relied on "PT Woods' unsupported conclusions from more than a year earlier"[12] (Tr. 964) and were "internally unsupported" (Tr. 965). In her prior discussion of PT Woods's April 2023 functional capacity evaluation, the ALJ had observed that the evaluation was "inconsistent with the medical evidence of record," including an "occupational/physical therapy evaluation" from four months earlier (December 2022) that "assessed [Ms. Matchette] as having no therapy needs." (Tr. 963.) The ALJ had also observed that PT Woods's evaluation was "internally unsupported," as it found Ms. Matchette "tested into a sedentary work category" but concluded she was "not . . . capable of performing this type of work." (*Id.*) Adding another layer to the supportability concerns, the ALJ observed that PT Woods's assessment took place "more than a year earlier" than Dr. Wilford's opinions relying on the assessment. (Tr. 964.)

The ALJ also found Dr. Wilford's opinions "internally unsupported and longitudinally inconsistent with the limited findings of record[.]" (Tr. 965.) A review of examination findings in the treatment records from Dr. Wilford that the ALJ referenced in her decision bears out this conclusion.[13] For example, examination findings were unremarkable at treatment visits in January 21, 2022 (Tr. 962, 641-42) and July 17, 2023 (Tr. 964, 1354). At a July 22, 2022 visit (Tr. 963), examination findings were unremarkable aside from mild pain in the right wrist (Tr.

[12] Dr. Wilford sent PT Wood's April 19, 2023 evaluation with disability paperwork he completed on June 11, 2024 (Tr. 1296) and noted "see attached functional capacity eval" in his medical source statement (Tr. 1265).

[13] The ALJ was not required to "reproduce the list of these treatment records a second time" when evaluating a medical opinion. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)).

855). And at a January 16, 2024 visit (Tr. 964), examination findings were unremarkable except for mild symptoms with Tinel's on the right wrist (Tr. 1336-37). The ALJ thus adequately and accurately discussed the supportability of Dr. Wilford's medical opinions.

Ms. Matchette also asserts that it is "interesting to note" that medical expert Dr. Karpitskiy "testified that he agreed with the limitations set forth in the medical source statement at 10F." (ECF Doc. 8, p. 17.) Interesting or not, the ALJ acknowledged and considered Dr. Karpitskiy's adoption of Dr. Wilford's limitations when she concluded that Dr. Wilford's opined limitations were not persuasive. (Tr. 965.) The ALJ articulated her reasons for not adopting Dr. Wilford's opined limitations, and was not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a)

For the reasons set forth above, the Court finds the ALJ adequately explained her reasons for finding Dr. Wilford's medical opinions unpersuasive, and further finds that Ms. Matchette has not met her burden to show that the ALJ's findings lacked the support of substantial evidence

Accordingly, the Court finds the second assignment of error lacks merit.

## V. Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

September 11, 2026

*/s/Amanda M. Knapp*

AMANDA M. KNAPP
United States Magistrate Judge